1

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9              **EASTERN DISTRICT OF CALIFORNIA**

10

11   VANESSA NAKI HENRY,                    )   Case No.: 1:15-cv-00100 - JLT
                                            )
12              Plaintiff,                  )   ORDER DIRECTING ENTRY OF JUDGMENT IN
                                            )   FAVOR OF DEFENDANT CAROLYN COLVIN,
13        v.                                )   ACTING COMMISSIONER OF SOCIAL
                                            )   SECURITY, AND AGAINST PLAINTIFF
14   CAROLYN W. COLVIN,                     )   VANESSA HENRY
     Acting Commissioner of Social Security,)
15                                          )
                Defendant.                  )
16                                          )
                                            )
17   _____)

18        Plaintiff Vanessa Henry asserts she is entitled a period of disability and disability insurance

19   benefits under Title II of the Social Security Act.  Plaintiff argues the administrative law judge erred

20   evaluating the medical record and in rejecting credibility of her subjective complaints.  Because the

21   ALJ applied the proper legal standards and substantial evidence supports the determination, the

22   administrative decision is **AFFIRMED**.

23                              **BACKGROUND**

24        On November 21, 2011, Plaintiff filed an application for benefits, in which she alleged

25   disability beginning August 1, 2010.  (Doc. 7-3 at 33)  The Social Security Administration denied the

26   applications at the initial level on April 10, 2012, and upon reconsideration on December 4, 2012.  (*Id.*;

27   Doc. 7-5 at 4-8, 11-15)  Plaintiff requested a hearing, and testified before an ALJ on July 10, 2013.  (*Id.*

28   at 33, 55)  The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an

1  order denying benefits on July 29, 2013.  (*Id.* at 17-26)

2      Plaintiff filed a request for review of the decision with the Appeals Council, which denied the

3  request on November 21, 2014.  (*Id.* at 2-4)  Therefore, the ALJ's determination became the final

4  decision of the Commissioner of Social Security.

5  **STANDARD OF REVIEW**

6      District courts have a limited scope of judicial review for disability claims after a decision by

7  the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact,

8  such as whether a claimant was disabled, the Court must determine whether the Commissioner's

9  decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's

10  determination that the claimant is not disabled must be upheld by the Court if the proper legal standards

11  were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health &*

12  *Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

13      Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a

14  reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S.

15  389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole

16  must be considered, because "[t]he court must consider both evidence that supports and evidence that

17  detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

18  **DISABILITY BENEFITS**

19      To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to

20  engage in substantial gainful activity due to a medically determinable physical or mental impairment

21  that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C.

22  § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

23  > his physical or mental impairment or impairments are of such severity that he is not only
24  > unable to do his previous work, but cannot, considering his age, education, and work
   > experience, engage in any other kind of substantial gainful work which exists in the
25  > national economy, regardless of whether such work exists in the immediate area in
   > which he lives, or whether a specific job vacancy exists for him, or whether he would be
   > hired if he applied for work.

26

27  42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v.*

28  *Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability,

2

1   the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial

2   gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

3   **ADMINISTRATIVE DETERMINATION**

4         To achieve uniform decisions, the Commissioner established a sequential five-step process for

5   evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f).  The process requires

6   the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of

7   alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the

8   listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had

9   the residual functional capacity to perform to past relevant work or (5) the ability to perform other work

10   existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial

11   and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927.

12   **A.     Medical Evidence**

13         Plaintiff first visited the Sacramento Native American Health Center on October 19, 2010.

14   (Doc. 7-8 at 47)  At an intake appointment with Gerry Shea, a licensed clinical social worker, Plaintiff

15   reported she was "currently unemployed, [and] had to leave her job in San Diego due to having panic

16   attacks and social phobia on the job."  (*Id.*)  Plaintiff said that about two to three years before, "she

17   began to notice severe mood dysregulation, panic attacks including shortness of breath, feelings of

18   doom and difficulty concentrating… racing thoughts, poor impulse control," and inability to calm

19   down.  (*Id.*)  Ms. Shea noted that Plaintiff "also describe[d] feelings of deep depression, anhedonia,

20   poor concentration, irritability, agitation, … hopelessness and sleep disturbance" that could last for

21   days or weeks.  (*Id.*)  According to Ms. Shea, Plaintiff reported she was molested by her stepfather

22   from the ages of 9 to 12, and he "eventually apologized and the behaviors stopped."  (*Id.*)  Plaintiff

23   reported she attempted to commit suicide when she was 13.  (*Id.* at 47-48)  When she quit her job, she

24   returned to live with her mother, who was still married to the man.  (*Id.*)  Ms. Shea noted:

25       This 30 year old female presents depressed, meeting diagnostic criteria for (complex)
26       PTSD, prolonged, chronic, Depression.  Because her aunt and grandmother have Bipolar
    Disorder, Bipolar 2 cannot be ruled out at this time, although she does not meet
27       diagnostic criteria for Bipolar 2.  She [is] motivated for treatment and accepted a follow-
    up appointment in one week.

28   (*Id.* at 48)

3

Plaintiff visited Dr. Geoffrey Booth for the first time on October 26, 2010.  (Doc 7-8 at 4, 30)
She reported she had "lifelong asthma" and was taking Advair.  (*Id.*)  In addition, Plaintiff said she had
a history of molestation.  (*Id.* at 4)  She complained of poor sleep, anxiety, mood swings, and racing
thoughts.  (*Id.*)  Plaintiff told Dr. Booth she had "some suicidal thoughts" but she would "not kill
herself [because] of family."  (*Id.*)  Plaintiff "had some impulsive behavior but no sexual promiscuity,"
and she denied having manic episodes.  (*Id.*)  Dr. Booth found Plaintiff's asthma was "stable" and
noted he would change Plaintiff's medication from Advair if she did "not have an asthma attack over
the winter."  (*Id.*)  He did not believe Plaintiff had a history of bipolar disorder, but prescribed Prozac
and Seroquel for Plaintiff's "[complaints of] PTSD & poor sleep & Anxiety."  (*Id.*)

On November 9, 2010, Plaintiff had an appointment with Ms. Shea, where she reported having
"shame about having to take medication."  (Doc. 7-8 at 73)  Plaintiff said her "depression [was] a little
better" and she was no longer having nightmares.  (*Id.*)  However, she was unable to drive to the
appointment "due to anxiety."  (*Id.*)  Ms. Shea noted that Plaintiff "agree[d] to file for SSDI."  (*Id.*)

On December 20, 2010, Plaintiff reported she had "racing thoughts" and she was "not having
much improvement on Prozac."  (Doc. 7-8 at 3)  Dr. Booth discontinued her prescription for Prozac,
and changed the medication to Effexor.  (*Id.*)  However, the prescription was changed to Paxil on
January 6, 2011, after Plaintiff reported she could not afford the Effexor.  (*Id.*)

On January 20, 2011, Plaintiff told Ms. Shea that she had "stayed up almost all night for 3
nights."  (Doc. 7-8 at 67)  Also, Plaintiff complained of racing thoughts, impulsive over-spending,
agitation, anxiety and restlessness, pressured speech and her friends telling her 'you're not acting like
you.'"  (*Id.*)  Ms. Shea believed Plaintiff exhibited "some minor thought distortion consistent with
Bipolar Disorder" and that she "describe[d] symptoms consistent with Bipolar II disorder."  (*Id.*)

On February 24, 2011, Ms. Shea noted Plaintiff was "newly diagnosed with Bipolar II" and was
adjusting to the diagnosis and treatment.  (Doc. 7-8 at 65; Doc. 7-9 at 22)

Dr. Paul Martin performed a consultative psychological evaluation on March 1, 2011.  (Doc. 7-8 at 5-8)  Plaintiff reported she had Bipolar Disorder and PTSD.  (*Id.* at 5)  Dr. Martin noted:

> The claimant reported a recent manic episode where she had a loss of need for sleep, had
> gone on shopping sprees, had elevated euphoric mood, pressured and rapid speech,
> increased level of activity, and engaged in impulsive and uncharacteristic behavior.  This

4

lasted about 24 hours and it was the first episode that she has ever had to this degree.  She has had depression in the past and continues to experience symptoms of depression including low energy, poor motivation, social withdrawal, avoidant behavior, anhedonia, and poor motivation.  The claimant has also begun to develop some anxiety and does engage in avoidant behavior, but has to force herself sometimes to get out of the house or get out of bed.  The claimant presents with a remote history of sexual molestation between the ages of 9 and 12 by her current stepfather.  No charges had ever been made.  The claimant is now actually living with the stepfather.  The claimant reports having severe problems with trust.  She is hypervigilant, has recurring intrusive thoughts, and appears to meet criteria for PTSD….  The claimant did become suicidal awhile back when she was having a tremendous amount of stress, including an abusive work environment.

(*Id.* at 5)  Plaintiff told Dr. Martin that she was "steadily employed working as an administrative assistant," but "stopped working [in] October 2010 after she become emotionally distressed and began to experience suicidal ideation."  (*Id.* at 6)  She reported she was "able to prepare simple meals for herself" and "do household chores."  (*Id.*)  Further, Plaintiff said she was able to drive and she did "not utilize public transportation due to the crowd factor and she [felt] very uncomfortable."  (*Id.*)

Upon examination, Dr. Martin observed that Plaintiff's "[m]ood was fair" and "[a]ffect was full in range."  (Doc. 7-8 at 6)  Plaintiff "recalled 3 out of 3 words after a brief delay," and Dr. Martin determined her "[m]emory for recently learned information was intact" and her "[a]ttention and concentration was adequate."  (*Id.*)  In addition, Dr. Martin opined Plaintiff's "insight and judgment appeared to be adequate," based upon her ability to interpret proverbs and compare identified objects.  (*Id.*)  Dr. Martin concluded Plaintiff's performance on the mental status examination was "within normal limits," and there was no "evidence of cognitive disruption" beyond difficulties with math calculations.  (*Id.*)  According to Dr. Martin:

The claimant had no difficulty understanding, remembering, and carrying out simple instructions.  Claimant had no difficulty with detailed and complex instructions.  Claimant had no difficulty maintaining attention and concentration for the duration of the evaluation.  Claimant's pace was not decreased.  Claimant demonstrated mild difficulty with pace and persistence.  The claimant had moderate difficulty enduring the stress of the interview.  Claimant is likely to have moderate difficulty adapting to changes in routine work-related settings.  Based upon observations of current behavior and reported psychiatric history, the claimant's ability to interact with the public, supervisors, and coworkers there appears to be moderate impairment.

(*Id.* at 7)  Dr. Martin gave Plaintiff a GAF score of 58[1], and opined her prognosis was "[f]air with

---

[1] Global Assessment Functioning ("GAF")  scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health- illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV). A GAF

1    comprehensive mental health services." (*Id.*)

2            On March 14, 2011, Plaintiff reported she was "sleeping well; doing well," and had an

3    increased appetite. (Doc. 7-8 at 39)  In addition, Plaintiff said she was "socializing more" and "only

4    had one day she stayed in the house." (Doc. 7-9 at 19) Dr. Booth noted an increase in Plaintiff's blood

5    pressure and warned her about overeating and weight gain. (Doc. 7-8 at 39)  He noted Plaintiff's

6    "overall functional status is poor but seems to be gradually improving." (*Id.*)  Dr. Booth opined

7    Plaintiff was "still… unable to work," but was "hopeful that she [would] be able to [return to work] by

8    7/31/11." (*Id.*)

9            On May 18, 2011, Plaintiff reported she had been angry, fearful, depressed, and "not interested

10   in life or able to go outside." (Doc. 7-8 at 38, 61) In addition, she said she was "being triggered" by

11   living with her mother and step-father, but believed her medication was "keeping [her] mood stable."

12   (*Id.* at 61)  Dr. Booth prescribed Abilify for Plaintiff. (*Id.* at 38)  At a follow-up appointment in June,

13   Plaintiff said she felt like her suicidal thoughts "are resolving & that the Abilify is really helping." (*Id.*

14   at 37)  Plaintiff told Ms. Shea that she was feeling bored and would consider enrolling at a junior

15   college "to take some classes or something." (*Id.* at 76)  Plaintiff was "not worried about mania." (*Id.*)

16           In July 2011, Plaintiff complained of a lack of motivation, "family dynamic issues," and

17   depression. (Doc. 7-8 at 56)  In addition, Plaintiff informed Dr. Booth that she believed her Paxil was

18   aggravating her symptoms. (*Id.* at 36)  She said she had some suicidal ideas "but no plan" and she

19   promised to not act on the thoughts. (*Id.*)  Dr. Booth told Plaintiff to stop taking Paxil by gradually

20   decreasing the amount she was taking daily. (*Id.*)

21           On August 4, 2011, Plaintiff told Ms. Shea that she was "having a difficult time dealing with

22   living with her mother and step-father," and she was "not sure [she] can really get better living with

23   them." (Doc. 7-8 at 54)  Plaintiff also said her "weight gain [was] still 'major' in her depression," and

24   that she "lost 4 lbs working out everyother [sic] day." (*Id.*)   On August 25, Plaintiff told Dr. Booth that

25   she was "feeling much better," and she did not have any suicidal ideations. (Doc. 7-8 at 34) Dr. Booth

26   opined Plaintiff was "doing well" and had "improved off Paxil and on Abilify." (*Id.*)

27   _____

28   score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." *Id.*

Plaintiff reported she was "doing poorly" and had suicidal ideations on September 15, 2011. (Doc. 7-8 at 33)  In addition, Plaintiff said she felt "like she's in crisis all the time."  (*Id.*)  Dr. Booth noted Plaintiff was "getting therapy, but continue[d] to live in same house [with] perpetrator where [she] was molested."  (*Id.*)  He opined Plaintiff's Bipolar disorder was "uncontrolled despite several medical interventions."  (*Id.*)

On September 26, 2011, Ms. Shea notified Dr. Booth that Plaintiff "requested a letter for her on-going disability stating you are her treating physician and don't expect her to be able to work for one full year."  (Doc. 7-8 at 31)  Ms. Shea asked Dr. Booth to write the letter if he agreed, "so [Plaintiff] can continue disability."  (*Id.*)  Dr. Booth wrote the letter on October 5, 2011.  (Doc. 7-8 at 30)  He noted that he began treating Plaintiff for a mood disorder but "[o]ver time it became clear that [Plaintiff] suffers from a severe form of Bipolar Disease."  (*Id.*)  Dr. Booth opined:

> [She] has only had minimal improvement in her condition despite a number of medical interventions.  Over the last year or so Ms Henry's health has deteriorated and I expect Ms Henry to remain unemployable for well over a year into the future barring any dramatic improvement in her condition, which is doubtful. I recommend that this patient be awarded disability in order to help her meet the costs of her expenses.

(*Id.*)

On November 3, 2011, Dr. Booth noted Plaintiff's Bipolar Disorder was "very difficult to manage."  (Doc. 7-8 at 28)  Plaintiff was hospitalized on a 5150 hold after "reveal[ing] to her counselor that she had suicidal thoughts of thinking of cutting her wrists or overdosing."  (*Id.* at 11, 17)  Plaintiff weighed 252 pounds, and reported she had "lost 30 pounds in the last 2 months due to her depressive illness."  (*Id.* at 11, 14)  Dr. Manganas observed that Plaintiff was "psychomotorically retarded" and depressed.  (*Id.* at 18)  Dr. Manganas diagnosed Plaintiff with "Major depression, recurrent, severe, nonpsychotic- dysthymic disorder" and prescribed Wellbutrin.  (*Id.* at 18-19)  On November 6, Dr. Rolf Palmer noted Plaintiff's mood was "excellent" and her GAF score had increased from 20 to 55.[2]  (*Id.* at 11)  In addition, Dr. Palmer believed Plaintiff displayed "relatively good insight and intact judgment" and her prognosis upon discharge was good.  (*Id.* at 12)

---

[2] A GAF score of 20 indicates "[s]ome danger of hurting self or others (e.g. suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene… OR gross impairment in communication (e.g., largely incoherent or mute).  *DSM-IV* at 34.  The GAF score of 55 indicates Plaintiff's symptoms were "moderate" upon discharge.  *Id.*

7

1    On November 15, 2011, Plaintiff had a follow-up appointment with Dr. Booth.  (Doc. 7-8 at 27)

2    She reported she was feeling "much better" and her depression was "improving on Wellbutrin."  (*Id.*)

3    However, the same date Plaintiff told Ms. Shea that she was "frustrated" and believed "therapy [was]

4    not helping her and medications only marginally."  (*Id.* at 52) On November 30, Plaintiff "reported

5    modest improvement in [symptoms] and absence of the real dark thoughts & feelings."  (*Id.* at 26)  Dr.

6    Booth observed that Plaintiff "still appear[ed] to be somewhat agoraphobic and frightened."  (*Id.*)  He

7    increased the prescription for Wellbutrin.  (*Id.*)  On January 4, 2012, Dr. Booth noted Plaintiff was

8    "doing well" and continued to respond to Wellbutrin.  (Doc. 7-8 at 25)

9    Dr. Sadda Reddy reviewed the record related to Plaintiff's reported physical impairments on

10   February 23, 2012.  (Doc. 7-4 at 910)  Dr. Reddy noted Plaintiff did not have any emergency room

11   visits or hospitalizations for asthma.  (*Id.* at 10) Dr. Reddy observed the treatment notes indicated

12   Plaintiff's "asthma [was] stable on Advair and ventolin" and her lungs were clear upon an examination.

13   (*Id.*)  Accordingly, Dr. Reddy opined Plaintiff's asthma did "not meet or equal any listing" and a

14   residual functional capacity "with asthma precautions is appropriate."  (*Id.*)

15   Dr. Philip Cushman performed a consultative psychological evaluation on March 14, 2012.

16   (Doc. 7-8 at 81)  Dr. Cushman reviewed records from Dr. Martin as well as progress notes from Dr.

17   Booth "starting from October of 2010 and ranging up through January 2012."  (*Id.*)  Plaintiff reported

18   she used marijuana several times as a teenager and drank "alcohol on a regular basis at age 21 and

19   continued up to only age 24," but had not consumed alcohol for one year.  (*Id.* at 82)  In addition,

20   Plaintiff reported she was sexually abused "between the ages of 9 and 12 by a friend of the family."

21   (*Id.*)  Dr. Cushman noted:

22           Currently, on an average day Ms. Henry spends most of her time in the house and is
23           usually in her bedroom watching television or going on the computer.  On the computer,
             she likes to check her email as well as go on Facebook. She also enjoys watching the
24           Food Network on television.  She indicates she spends a lot of time sleeping during the
             day.  She reports she does not perform any household chores or any food preparation,
25           leaving this to her family members.

26   (*Id.* at 83)  However, Dr. Cushman also indicated that Plaintiff reported "she sometimes prepares her

27   own meals" and "occasionally does her own dishes."  (*Id.* at 85) Plaintiff explained she had "social

28   anxiety" that caused her to cry and "become[] very shaky with shortness of breath….when facing large

grounds, new people, or unfamiliar settings." (*Id.* at 84)  She reported she was losing weight and ate twice a day.  (*Id.* at 84)

Dr. Cushman observed that Plaintiff "presented as mildly to moderately depressed," and reported she was feeling "okay." (Doc. 7-8 at 84)  He noted Plaintiff "could easily express herself in ongoing, short sentences, giving the impression of at least low-average intellect." (*Id.* at 85)  Plaintiff was also "generally able to respond to direct questions with direct answers." (*Id.*)  Dr. Cushman noted: "She was able to immediately recall three out of three words and after a five-minute delay, could recall two out of three words.  She was able to listen to and inconsistently recall up to six digits forwards and inconsistently four backwards." (*Id.*)  He diagnosed Plaintiff with "Post-Traumatic Stress Disorder, chronic" and "Major Depressive Disorder, recurrent, mild severity." (*Id.* at 86)  Dr. Cushman noted Plaintiff's psychosocial stressors included unemployment and the fact that Plaintiff was "living with [her] mother." (*Id.*)  Dr. Cushman opined:

> Vanessa Henry is capable of performing some detailed, complex, simple and repetitive tasks in a work setting. She will, however, have difficulties at this time with regular attendance and consistent participation with issues around malaise and confusion. With more aggressive, consistent psychiatric treatment, this condition should improve significantly within the next nine months. She would then be able to more consistently attend and participate in a work setting. The same can be said for her ability to work a normal workday or work week at this time. Special or additional supervision will not be needed, once she improves in her mood. She does appear capable of following simple verbal instructions from supervisors, but not complex instructions at this time. As her mood lifts, she will also be able to follow complex instructions from supervisors. At the current time, she will have difficulties getting along with supervisors, coworkers and the general public. As her mood lifts, she should be able to get along with these people. The same can be said for her ability to deal with the usual stressors encountered in a competitive work environment.

(*Id.* at 86)  Dr. Cushman concluded that Plaintiff's GAF score was 55.  (*Id.*)

Dr. Dara Goosby reviewed the record related to Plaintiff's reported mental impairments on April 10, 2012. (Doc. 7-4 at 11-12)  Dr. Goosby noted Dr. Booth had reported minimal improvement in October 2011, after which Plaintiff was hospitalized in November 2011.  (*Id.* at 11)  She found Plaintiff was "[n]ot significantly limited" with her ability to understand, remember, and carry out short and simple instructions.  (*Id.* at 14-15)  Also, Dr. Goosby opined Plaintiff had "moderate" limitations with her ability to maintain attention and concentration for extended periods, to maintain regular attendance, to complete a workday and workweek without interruptions from psychologically-based

symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.* at 15) Dr. Goosby observed that although Plaintiff had one episode of decompensation, it did not appear that her symptoms "persisted at marked levels for a 12 month period since [the alleged onset date]" because Plaintiff's results at the consultative examination with Dr. Cushman were "mostly" within normal limits.  (*Id.* at 11) Further, she noted Plaintiff's symptoms improved after her hospitalization and appeared "to be adequately controlled" with medication.  (*Id.*) Accordingly, Dr. Goosby concluded Plaintiff "capable of at least simple tasks with no public contact… and would improve with more consistent and aggressive [treatment]."  (*Id.*)

In July 2012, Plaintiff visited the clinic "for refills on asthma medication." (Doc. 7-8 at 101) She reported she was "out of advair and … almost out of albuterol inhaler." (*Id.*)  Plaintiff said she was "wheezing a lot lately at night with the hot weather" and "had to use [a] friend's nebulizer once [in the] last week." (*Id.*)  However, upon examination, Plaintiff denied having "shortness of breath, coughing, or wheezing," and her lungs were clear with "[n]ormal respiratory effort." (*Id.*)  In addition, Plaintiff said she was "not using drugs, only occasional[ly] drinking." (*Id.* at 118) Dr. Booth noted Plaintiff's "active problems" included depression, asthma, and obesity, but she was "going much better" with Wellbutrin.  (*Id.* at 103)  He noted that Plaintiff reported she was "getting out of the house some and exercisin[g] occasionally." (*Id.*)

On August 20, 2012, Plaintiff reported she was "doing well," and her mood was "good."  (Doc. 7-8 at 105)  She told Dr. Booth that she had a boyfriend and was happy.  (*Id.*)  Plaintiff said she "still ha[d] little interest in doing things," but "she did go camping and that was big for her."  (*Id.*) Dr. Booth opined Plaintiff's mood and affect were normal, and her judgment was normal.  (*Id.*)

Dr. Archimedes Garcia reviewed the record on December 3, 2012.  (Doc. 7-4 at 26)  He observed that Dr. Booth's treatment notes indicated Plaintiff was "[d]oing much better" and "doing well" with the prescribed treatment.  (*Id.* at 26)  Dr. Garcia agreed with the assessment of Dr. Goosby and affirmed it "as written."  (*Id.*)

In January 2013, Plaintiff informed Dr. Booth that "she had been out of her medications for approx 1 month and state[d] she [was] not depressed." (Doc. 7-8 at 122)  In addition, Plaintiff stated she was "doing well" and was "very happy."  (*Id.*)  Plaintiff reported she was "on a cooking spree and

10

[was] cooking a lot of different types of foods." (*Id.*)  She was sleeping only 4-6 hours per night, but believed Trazodone helped with her sleep.  (*Id.*)  Dr. Booth determined Plaintiff's mood, affect, and judgment were normal.  (*Id.*)

Dr. Les Kalman conducted a psychological evaluation upon the request of Plaintiff's counsel on June 14, 2013.  (Doc. 7-9 at 41)  He opined Plaintiff had "Post Traumatic Stress Disorder" and "Bipoloar Disorder- Mixed- Social Anxiety - Agoraphobia."  (*Id.*)  On a checklist form, Dr. Kalman indicated the following "positive clinical findings that demonstrate and/or support [his] diagnosis": sleep disturbance, mood disturbance, emotional lability, psychomotor agitation or retardation, difficulty thinking or concentrating, social withdrawal or isolation, manic syndrome, and intrusive recollections of a traumatic experience.  (*Id.* at 42)  He believed Plaintiff's primary symptoms were mood swings, "flashbacks – nightmares" and depression.  (*Id.* at 43)  Dr. Kalman found "no evidence of limitation" for Plaintiff's ability to understand, remember, and carry out "simple one or two-step instructions," though she had "moderate" limitations with understanding and remembering detailed instructions.  (*Id.* at 44) He opined Plaintiff had "marked" limitations with carrying out detailed instructions, accepting instructions, and "respond[ing] appropriately to criticism from supervisors."  (*Id.*)  Dr. Kalman also believed Plaintiff was "moderately limited" with her ability to maintain attention and concentration for extended periods, working in coordination with or proximity to others without being distracted by them, interacting with the general public, and getting along with co-workers or peers.  (*Id.* at 44-45)  Dr. Kalman concluded Plaintiff was incapable of tolerating "even 'low stress'" and was likely to miss work more than three times a month.  (*Id.* at 47-48)  According to Dr. Kalman, "the earliest date that the description of symptoms and limitations in [the] questionnaire" applied was 2008.  (*Id.* at 48)

**B.    Administrative Hearing Testimony**

Plaintiff testified before an ALJ on July 10, 2013.  (Doc. 7-3 at 55)  She reported she had completed high school and some college.  (*Id.* at 56)  Plaintiff said she was last employed in August 2010, when she worked "for a temp agency as . . . a front desk clerk."  (*Id.* at 57)  Plaintiff reported she worked "only about two to three weeks" at the doctor's office where she was placed.  (*Id.* at 58)  She said that she previously worked as "an executive admin."  (*Id.*)  Plaintiff believed she was no longer able to work because she was bipolar, and had panic attacks, depression, and social anxiety.  (*Id.*)  She

1  explained, "Physically I'm fine.  Mentally is where I have the problem."  (*Id.* at 61)

2          She reported that she had been treated by a doctor for her mental problems at the Native

3  American Health Clinic for two to three years, and "was talking to a therapist there and getting

4  medications and everything." (Doc. 7-3 at 58)  Plaintiff explained she "was greeting free care there"

5  because she is Native American, but laws changed "so you now how to pay for anything."  (*Id.* at 59)

6  She said she could not afford to drive from Modesto to the clinic in Sacramento, "plus pay for . . .

7  seeing the doctor and then also pay for medications."  (*Id.* at 58-59)  Plaintiff stated that she was "on a

8  waiting list to see another doctor."  (*Id.* at 58)

9          Plaintiff reported her social anxiety caused "racing thoughts" and made her feel like she was

10  "going to jump out of [her] skin." (Doc. 7-3 at 59)  She explained panic attacks caused her to shake,

11  feel like she could not breathe, and "want to scream."  (*Id.* at 62)  Plaintiff testified her panic attacks

12  were caused by "[b]eing around people, lots of people, new situations."  (*Id.*)  She also said she did "a

13  lot of crying" and stayed in her room.  (*Id.* at 59)  Plaintiff stated that she felt "hopelessness, a lot of

14  like negative feelings and tired, wanting to give up, that sort of things."  (*Id.*)  Plaintiff reported her

15  mind was "constantly racing" so she would "try and quiet [her] mind" by reading, getting on the

16  computer, or watching television.  (*Id.* at 60)  Also, Plaintiff testified that her bipolar disorder caused

17  her to suffer from manic spells where she would be "up and happy" and then go into a depressive state.

18  (*Id.* at 63-64)

19          She said that she would "sometimes" help around the house, by cleaning a bathroom and

20  making dinner. (Doc. 7-3 at 60)  Plaintiff explained that preparing food "seems to help… if [she] can

21  follow a recipe and focus on something and stuff."  (*Id.*)  Also, Plaintiff said she would get out of the

22  house by going camping "every once in a while" or attending religious services "a couple times a

23  week" when she felt that she could "handle leaving" the house.  (*Id.*)  However, when she was in a

24  depressed state, which could last for "a week or two," she would not clean her room or shower, and she

25  would want to cut her arms.  (*Id.* at 64)  She testified that her medication made her symptoms

26  "manageable" and she felt like she was able to control herself.  (*Id.* at 59)

27          Plaintiff reported she had no problems with her memory, but did have difficulty concentrating.

28  (Doc. 7-3 at 65)  She explained that her concentration was "okay" on a good day, but on a bad day she

did "a lot of crying," praying, reading, and "working [her] way through not wanting to hurt [herself]." (*Id.*) She estimated that she had "at least five" bad days per month. (*Id.* at 65-66) Also, Plaintiff reported she had attempted to injure herself three times in the past, and was placed on a 5150 hold on one occasion. (*Id.* at 61) She explained that she went to see her therapist but "it was just a really bad day" and she wanted to end her life. (*Id.* at 62)

Vocational expert George Meyers also testified at the hearing. The ALJ asked the VE to consider "a hypothetical individual with a high school education and the past work" the same as Plaintiff. (Doc. 7-3 at 67) The ALJ said the "individual can lift 50 pounds occasionally and 25 pounds frequently; she can stand and walk in combination for at least six hours in a work day and sit at least six hours in a workday." (*Id.*) In addition, the person could "frequently bend, stoop, twist, squat, kneel, crawl, and climb stairs; she should not be required to climb ladders, ropes or scaffolds; she should not work at heights or around hazardous machinery; she should not be exposed to concentrated amounts of dust, fumes, smoke or other respiratory irritants." (*Id.*) The ALJ added that the hypothetical person had mental limitations, and "should be limited to work involving simple instructions and having no more than occasional contact with co-workers and the public." (*Id.*) The VE opined a person with these physical and mental limitations was unable to perform Plaintiff's past relevant work. (*Id.*) However, the VE believed such a person could work in other "medium, unskilled" job positions, including dishwasher, DOT 599.687-030; laundry worker, DOT 361.685-018; and hand packer, DOT 920.587-018.[3] (*Id.*)

Next, Plaintiff's counsel, Raymond Uguarte, asked the VE to consider an individual who "would have difficulty with the ability to maintain regular attendance and consistent participation with issues around malaise and confusion." (Doc. 7-3 at 69) Further, Mr. Ugarte stated the hypothetical individual would have "difficulty" with "working a normal work day or work week;" "getting along with supervisors, co-workers and the general public;" and "dealing with the usual stressors encountered in a competitive work environment." (*Id.* at 69) Mr. Ugarte asked the VE to "quantify… difficulty as

---

[3] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1).

1  affecting the individual 10 percent of the work time." (*Id.* at 69-70)  The VE opined such a person was

2  not employable.  (*Id.* at 70)

3          Mr. Ugarte also asked the VE to consider an individual with mental limitations based upon

4  those assessed by Dr. Kalman.  (Doc. 7-3 at 70)  In setting forth the limitations, Mr. Ugarte defined

5  "marked" as "effectively precludes" and "moderate" as "significantly affects but does not totally

6  preclude the individual's ability to perform the activity."  (*Id.*)  With these definitions, Mr. Ugarte

7  asked the VE to consider an individual who was "markedly limited" with her "ability to carry out

8  detailed instructions" and "to accept instructions and respond appropriately to criticism from

9  supervisors."  (*Id.*)  The VE opined such a person was unable to work in the national economy.  (*Id.*)

10 **C.      The ALJ's Findings**

11         Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial

12 activity after the alleged disability date of August 1, 2010.  (Doc. 7-3 at 35)  Second, the ALJ found

13 Plaintiff has the following severe impairments: "obesity and bipolar disorder, primarily depressed."

14 (*Id.*)  At step three, the ALJ opined these impairments did not meet or medically equal a listed

15 impairment.  (*Id.* at 36)  Next, the ALJ determined:

16         [T]he claimant has the residual functional capacity to perform medium work as defined
           in 20 CFR 404.1567(c) except she can sit up to six hours in an eight hour workday and
17         stand or walk in combination up to six hours each in an eight hour workday.  She can
           frequently twist, bend, squat, kneel, crouch, stoop, climb stairs, and crawl.  She should
18         not be required to climb ladders, ropes, or scaffolding.  She should not work around
           heights or hazardous machinery.  She should not be exposed to dust or other pulmonary
19         irritants.  She is limited to work involving simple instructions and having no more than
           occasional contact with coworkers and the public.
20

21 (*Id.* at 37)

22         With this residual functional capacity, the ALJ determined that Plaintiff was not capable of

23 performing her past work as an administrative assistant, clerk, or receptionist.  (Doc. 7-3 at 47)

24 However, the ALJ found Plaintiff was able to perform other "jobs that exist in significant numbers in

25 the national economy."  (*Id.*)  Thus, the ALJ concluded Plaintiff was not disabled as defined by the

26 Social Security Act.  (*Id.* at 48)

27                          **DISCUSSION AND ANALYSIS**

28         Appealing the decision to deny her application for benefits, Plaintiff asserts the ALJ erred in

                                             14

1    evaluating the medical record related to her mental impairments.  (Doc. 10 at 18-27)  In addition,

2    Plaintiff contends the ALJ erred in finding her claims of disabling limitations are not credible.  (*Id.* at

3    27-29)  On the other hand, Defendant argues, "the ALJ properly evaluated the [medical] opinions," and

4    that the administrative "decision is supported by substantial evidence and free of reversible legal error."

5    (Doc. 15 at 2, 15)

6    **A.      The ALJ's Credibility Determination**

7           When evaluating a claimant's credibility, an ALJ must determine first whether objective

8    medical evidence shows an underlying impairment "which could reasonably be expected to produce

9    the pain or other symptoms alleged."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)

10   (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).  Next, if there is no evidence of

11   malingering, the ALJ must make specific findings as to the claimant's credibility.  *Id.* at 1036.  In this

12   case, the ALJ determined Plaintiff's "statements about her impairments and functional limitations are

13   only partially credible." (*Id.* at 43)

14          The ALJ must base an adverse credibility determination on clear and convincing evidence

15   where there is no affirmative evidence of a claimant's malingering and "the record includes objective

16   medical evidence establishing that the claimant suffers from an impairment that could reasonably

17   produce the symptoms of which he complains."  *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d

18   1155, 1160 (9th Cir. 2008).  Factors the ALJ may consider include, but are not limited to: (1) the

19   claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and

20   conduct; (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to

21   seek treatment or follow a prescribed course of treatment and (5) testimony from physicians

22   concerning the nature, severity, and effect of the symptoms of which the claimant complains.  *Fair v.*

23   *Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th

24   Cir. 2002).  To support an adverse credibility determination, the ALJ "must identify what testimony is

25   not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821,

26   834 (9th Cir. 1996).

27          Here, the ALJ considered the Plaintiff's level of activity, inconsistent statements made by

28   Plaintiff, conflicts between Plaintiff's statements and the medical record, the effectiveness of her

treatment, and the objective medical evidence.  (*See* Doc. 9-3 at 23)  The Ninth Circuit has determined these may be relevant factors in assessing the credibility of a claimant.

### 1.    Inconsistent statements

An ALJ may consider "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).For example, in *Thomas*, the ALJ determined the claimant "had not been a reliable historian, presenting conflicting information about her drug and alcohol usage." *Id.*, 278 F.3d at 959.  Ms. Thomas denied using drugs and alcohol to one physician, but later "admitted to alcoholism and to smoking 'a little pot.'" *Id.*  On another occasion, Ms. Thomas reported "she had not drunk alcohol for 'several months' and 'had not smoked marijuana for about a year." (*Id.*)  The Ninth Circuit determined the ALJ did not err by inferring "that this lack of candor carries over to her description of physical pain." (*Id.*)

Similarly, in this case, the ALJ found Plaintiff made inconsistent statements regarding her weight loss, drinking alcohol, and using marijuana.  (Doc. 7-3 at 43)  Specifically, the ALJ noted that Plaintiff denied drinking on several occasions, but also reported that she "drank alcohol regularly from age 21 to 24." (Doc. 7-3 at 43, citing Doc. 7-8 at 4, 17; Doc. 7-9 at 37)  Further, the ALJ observed that on March 14, 2012, Plaintiff said "[h]er last use of alcohol was one year earlier," yet Plaintiff also told Dr. Booth that she drank occasionally on July 19, 2012.  (*Id.*, citing Doc. 7-8 at 82, 103)  Likewise, the ALJ found Plaintiff made inconsistent statements regarding her history of drug use, because she denied a history of drug use to Dr. Booth, yet Plaintiff also reported she had used marijuana several times to Dr. Cushman.  (*Id.*, citing Doc. 7-8 at 4, 82)

In addition, the ALJ noted Plaintiff made inconsistent statements regarding her weight loss, and whether it was due to exercise or her mental impairments, noting:

> On November 2, 2011, the claimant reported that she had lost 30 pounds in 2 months due to her "depressive illness" (Exhibit 3F, page 2).  She weighed 252 pounds.  Yet on August 4, 2011, the claimant weighed 275 pounds and she told Dr. Booth that she had started to exercise (Exhibit 4F, page 11).  Also on August 4, 2011, the claimant told social worker Gerry Shea that she lost 4 pounds working out every other day, and that her weight gain had been a major factor in her depression (Exhibit 4F, page 30).

(*Id.* at 44)  Thus, the ALJ believed Plaintiff's "weight loss was intentional, not due to any mental

impairment," contrary to what she reported to the doctor when she was hospitalized.  (*Id.*)

Because the ALJ identified several inconsistencies in Plaintiff's statements to physicians, her lack of candor supports the adverse credibility determination.  *See Thomas*, 278 F.3d at 959; *see also Verduzco v. Apfel,* 188 F.3d 1087, 1090 (9th Cir. 1999) (finding the claimant's "various statements regarding his drinking were not consistent" and supported the adverse credibility determination).

### 2.     Effectiveness of treatment

When assessing a claimant's credibility, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. §§ 404.1529(c), 416.929(c).  Importantly, when an impairment "can be controlled effectively with medication," it cannot be considered disabling.  *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).

The ALJ noted that Plaintiff's mental impairments "improved dramatically with treatment," particularly after she was prescribed Wellbutrin in November 2011.  (Doc. 7-3 at 41-42)  Specifically, the ALJ noted Plaintiff "told Dr. Booth that she felt much better on Wellbutrin" on November 15, 2011. (*Id.* at 41)  The ALJ also observed that Dr. Booth increased the prescription and indicated in January 2012 that Plaintiff "continued to respond to Wellbutrin and was doing well."  (*Id.*)  Further, the ALJ noted treatment notes from July 2012 "indicate[d] that the claimant reported she was doing well on Wellbutrin," and Dr. Booth also believed she was "doing much better."  (*Id.* at 42)  Plaintiff continued to report she was "doing well" in August 2012, and said she was "very happy"—even without her medication— in the most recent treatment notes, dated January 7, 2013.  (*Id.*)  Thus, the effectiveness of the treatment Plaintiff received supports the ALJ's adverse credibility determination.

### 3.     Conflicts with the medical record

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch*, 400 F.3d at 681 ("Although lack of

medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis").  Because the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

However, if an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to simply state that the testimony is contradicted by the record.  *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination").  Rather, an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ must identify "what evidence suggests the complaints are not credible").

### a.     Physical impairments

In this case, the ALJ found Plaintiff "embellishe[d] her complaints to the Administration." (Doc. 7-3 at 43)  For example, the ALJ noted that Plaintiff "reported having asthma attacks daily" in her "Adult Asthma Questionnaire" submitted to the Agency on January 24, 2012.  (Doc. 7-3 at 43, citing Doc. 7-7 at 47-48)  However, the ALJ noted Plaintiff also told Dr. Booth that she had no asthma attacks while taking Advair in October 2010.[4]  In addition, the ALJ observed that Dr. Booth believed Plaintiff's asthma was "stable," and she had normal respiratory functioning in November 2012.  (*Id.*, citing Doc. 7-8 at 3, 11)  Further, ALJ noted that in July 2012, "she denied shortness of breath, cough, or wheezing" and "[h]er lungs were clear with normal respiratory effort" during the examination.  (*Id.*, citing Doc. 7-8 at 101)  Accordingly, the ALJ concluded the record contradicted her claims, and that Plaintiff "simply <u>does not</u> have daily asthma attacks."  (*Id.*, emphasis in original)

Plaintiff now argues that she misunderstood the question presented on the form, which asked: "How often do you have asthma attacks?"  (Doc. 10 at 28; *see also* Doc. 7-7 at 47)  On the form, Plaintiff responded: "I have asthma attacks daily and use a rescue inhaler called Ventolin."  (Doc. 7-7 at 47)  According to Plaintiff, "It seems very apparent that, in responding to the question, Ms. Henry

---

[4] As discussed above, these inconsistent statements regarding her asthma attacks also support the ALJ's adverse credibility determination.  *See Smolen*, 80 F.3d at 1284.

construed 'asthma attacks' as 'asthma symptoms,' as she says both that she has 'attacks' daily, for which she takes her medication as prescribed." (Doc. 10 at 28)  However, Plaintiff's argument is undermined by the fact that Plaintiff also reported using a rescue inhaler "as needed."  Further, Plaintiff clearly knew the difference between asthma attacks and asthma symptoms when she told Dr. Booth that she had not suffered any asthma attacks and denied suffering symptoms including wheezing, coughing, and shortness of breath.  (*See* Doc. 7-7 at 47; Doc. 7-8 at 3, 11, 101)

> ### b.    Mental impairments

The ALJ also found Plaintiff's complaints of disabling mental impairments and an inability to concentrate were inconsistent with the medical record.  Although Plaintiff testified her mind was "constantly racing" (Doc. 7-3 at 60), the ALJ found the medical evidence demonstrated only "mild difficulties in maintaining concentration, persistence and pace." (*Id.* at 36)  As the ALJ observed, at the consultative examination with Dr. Martin, Plaintiff's "[a]ttention and concentration were adequate," and she "ha[d] no difficulty maintaining attention and concentration for the duration of the evaluation," though she "demonstrated mild difficulty with pace and persistence." (*Id.* at 39)

> ### c.    Conclusion

Given the conflicting statements by Plaintiff and the normal respiratory examinations, the ALJ carried his burden to identify evidence in the record that undermined the credibility of Plaintiff's assertions related to her asthma.  Similarly, the ALJ identified evidence in the record—including the opinion of a physician—that undermined Plaintiff's reports of a severe mental impairment.  Thus, the objective medical record supports the adverse credibility determination. *See Greger*, 464 F.3d at 972; *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (an ALJ may consider "contradictions between claimant's testimony and the relevant medical evidence").

### 4.    Daily activities

When a claimant spends a substantial part of the day "engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Fair*, 885 F.2d at 603).  For example, a claimant's ability to cook, clean, and manage finances may be sufficient to support an adverse finding find of credibility.

*See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008).  An ALJ may also conclude "the severity of . . . limitations were exaggerated" when a claimant exercises, gardens, and participates in community activities. *Valentine v. Comm'r of Soc. Sec. Admin.,* 574 F.3d 685, 693 (9th Cir. 2009). Notably, the Ninth Circuit has determined that "[e]ven where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."  *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (citing *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1225 (9th Cir. 2010); *Valentine*, 574 F.3d at 693)).

Here, the ALJ observed that Plaintiff "attends church, prepares meals, cleans her clothes, drives, reads, can follow a recipe…, uses a computer, [and] goes camping." (Doc. 7-3 at 36, internal citation omitted)  However, the ALJ failed to find Plaintiff's activities could be transferred to a work setting, or state Plaintiff spent a "substantial" part of her day engaged in such activities.  Moreover, the Ninth Circuit opined, "Daily household chores and grocery shopping are not activities that are easily transferable to a work environment."  *Blau v. Astrue*, 263 Fed. App'x 635, 637 (9th Cir. 2008). Thus, Plaintiff's activities of daily living were not clear and convincing evidence to discount her credibility.

Regardless, the ALJ met his burden of identifying other clear and convincing reasons supporting the adverse credibility determination, which were "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958.  As such, the flawed analysis regarding Plaintiff's daily activities was a harmless error, because it "does not negate the validity of the ALJ's ultimate credibility conclusion."  *Carmickle*, 533 F.3d at 1160 (quoting *Batson v. Comm'r of Soc. Sec. Admin*, 359 F.3d 1190, 1197 (9th Cir. 2004).

**B.      The ALJ's Evaluation of the Medical Record**

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes*

20

1  *v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  Further, an examining physician's opinion is given more

2  weight than the opinion of non-examining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.

3  1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

4       A physician's opinion is not binding upon the ALJ, and may be discounted whether or not

5  another physician contradicts the opinion.  *Magallanes*, 881 F.2d at 751.  An ALJ may reject an

6  *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and

7  convincing" reasons.  *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or

8  examining professional may be rejected for "specific and legitimate reasons that are supported by

9  substantial evidence in the record." *Lester*, 81 F.3d at 830. When there is conflicting medical evidence,

10  "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d

11  577, 579 (9th Cir. 1984).  The ALJ's resolution of the conflict must be upheld by the Court when there

12  is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d

13  1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the

14  evidence, and if the evidence can support either outcome, the court may not substitute its judgment for

15  that of the ALJ"). Here, Plaintiff contends the ALJ erred in evaluating the opinions of Drs. Booth,

16  Martin, Cushman, and Kalman related to her mental impairments.  (Doc. 10 at 18-27)

17      1.    Opinion of Dr. Booth[5]

18       The ALJ gave "[m]inimal weight" to the letter Dr. Booth wrote in October 5, 2011, in which he

19  opined Plaintiff suffered "from a severe form of Bipolar Disease and …only had minimal improvement

20  in her condition despite a number of medical interventions" and "recommend[ed] that []his patient be

21  awarded disability in order to help her meet the costs of her expenses." (Doc. 7-3 at 40)  The ALJ

22  noted the letter "was written at the bequest and direction of the claimant." (*Id.*)  Further, the ALJ found

23  the medical record did not support the opinion that Plaintiff was "unemployable," and that was a

24

25      [5] In March 2011, Dr. Booth opined Plaintiff was "still unable to work." (Doc. 7-3 at 39; Doc. 7-8 at 39)  The ALJ
26  rejected this opinion as contradicted by Dr. Booth's own treatment notes which indicated "the claimant's functional status was not in fact poor" and Dr. Booth's own opinion that Plaintiff was "doing well." (Doc. 7-3 at 39)  Plaintiff does not address the rejection of this opinion in her opening brief. (*See generally* Doc. 10 at 19-22)  Accordingly, the Court finds
27  any challenge to the opinion of Dr. Booth from March 2011 is waived.  *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (the Court will "review only issues with are argued specifically and distinctly," and when a claim
28  of error is not raised, the argument is waived).  Here, the Court addresses only Dr. Booth's opinion from October 2011.

1   conclusion "reserved to the Commissioner."  (*Id.*)

2       The Ninth Circuit has determined the opinion of a treating physician may be rejected for each

3   of the reasons articulated by the ALJ.  *See, e.g., Batson v. Comm'r of the Soc. Sec. Admin*., 359 F.3d

4   1190, 1195 (9th Cir. 2003) (an ALJ may reject an opinion when it is "unsupported by the record as a

5   whole"); *Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1985) ("[c]onclusory opinions by medical

6   experts regarding the ultimate question of disability are not binding on the ALJ"); *Matney v. Sullivan*,

7   981 F.2d 1016, 1020 (9th Cir. 1992) (ALJ may reject medical opinion where doctor acts as an

8   advocate in claimant's pursuit of benefits).

9           *a.      Issue reserved for the Commissioner*

10      Importantly, the determination of whether a claimant is disabled is reserved for the

11  Commissioner, and statements "by a medical source that [a claimant] is 'disabled' or 'unable to work'"

12  "are not medical opinions." 20 C.F.R. §§ 404.1527(e), 416.927(e).  Previously, this Court explained,

13  "[A]n ALJ is not obligated to provide detailed reasons for rejecting a medical expert's opinion

14  regarding the ultimate question of disability." *James v. Astrue*, 2012 U.S. Dist. LEXIS 139929, at * 25

15  (E.D. Cal. Sept. 27, 2012) (citing *Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1985)).  Dr. Booth's

16  belief that Plaintiff was "unemployable" is clearly a statement "that would direct the determination or

17  decision of disability." *See* 20 C.F.R. §§ 404.1527(e), 416.927(e).  Accordingly, the ALJ's decision to

18  give "[m]inimal weight" to Dr. Booth's statement was proper.

19          *b.      Totality of the medical evidence*

20      The Ninth Circuit has determined that inconsistency with the overall record constitutes a

21  legitimate reason for discounting a physician's opinion.  *Morgan v. Comm'r of the Soc. Sec. Admin*,

22  169 F.3d 595, 602-03 (9th Cir. 1999).  However, to reject an opinion as inconsistent with the medical

23  record, the "ALJ must do more than offer his conclusions."  *Embrey v. Bowen*, 849 F.2d 418, 421 (9th

24  Cir. 1988).  The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient

25  objective findings or are contrary to the preponderant conclusions mandated by the objective findings

26  does not achieve the level of specificity our prior cases have required." *Embrey*, 849 F.2d at 421-22.

27      Here, the ALJ found the opinion offered by Dr. Booth in October 2011 was not supported by

28  "the longitudinal history"—particularly the treatment records after November 2011.  (Doc. 7-3 at 40-

22

41)  The ALJ noted that when the letter was written, Plaintiff "was clearly having adjustment difficulties due to the rather bizarre living situations whereby she was living with the stepfather who allegedly molested her." (*Id.* at 40)  However, after Plaintiff was hospitalized and received a prescription for Wellbutrin, Plaintiff "reported modest improvement in symptoms." (*Id.* at 41)  As the ALJ noted, Dr. Booth then increased the amount of Wellbutrin and opined Plaintiff was "doing well" on several occasions in January 2012, July 2012, and August 2012. (*Id.* at 41, 42)  Thus, the ALJ concluded, "As is clear by the more recent treatment notes, her condition improved dramatically with treatment." (*Id.* at 42)

Because the ALJ met his burden to identify evidence in the record—including Dr. Booth's own notes regarding Plaintiff's response to treatment—the longitudinal evidence supports the ALJ's decision to give minimal weight to the opinion offered in October 2011.  *See Morgan*, 169 F.3d at 602-03; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (an ALJ may reject a physician's opinion if it is not supported by his own treatment notes).

### 2.    Opinion of Dr. Cushman

The ALJ gave "reduced weight" to the opinion of Dr. Cushman, who determined Plaintiff was "capable of performing some detailed, complex, simple and repetitive tasks in a work setting." (Doc. 7-3 at 41-42)  The ALJ noted Dr. Cushman believed Plaintiff "would have difficulties getting along with supervisors, coworkers and the general public," as well as "her ability to deal with the usual stressors encountered in a competitive work environment. (*Id.* at 41)  The ALJ explained the limitations of Dr. Cushman were undermined by inconsistencies in the report caused by Plaintiff's lack of candor with the physician, and her improvement with treatment. (*Id.* at 42)

#### a.    *Plaintiff's lack of candor and inconsistencies within the report*

As an initial matter, the ALJ found it was "unclear that the claimant was completely forthright with Dr. Cushman, because she told Dr. Cushman that she "gets along adequately with her stepfather, and that she was molested . . . by a 'friend of the family.'" (Doc. 7-3 at 41)  The ALJ also found "the evidence indicates that she does in fact have more activities than reported to Dr. Cushman," such as going camping. (*Id.*) Further, the ALJ noted that Dr. Cushman's report contained inconsistencies, caused by Plaintiff's lack of candor. (*Id.*) Specifically the ALJ observed: "Dr. Cushman noted that

23

1    'she does not perform any household chores nor any food preparation, leaving this to her family

2    members," which was contradicted by another statement that Plaintiff "microwaved herself rice earlier

3    in the day, and she 'sometimes prepares her own meals,' and occasionally does her own dishes." (*Id.*)

4         Importantly, the Ninth Circuit has determined an ALJ may reject an opinion when the physician

5    sets forth restrictions that "appear to be inconsistent with the level of activity that [the claimant]

6    engaged in." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001); *see also Fisher v. Astrue*, 429

7    Fed. App'x 649, 652 (9th Cir. 2011) (the ALJ set forth specific and legitimate reasons for rejecting a

8    physician's opinion where the assessment was based upon the claimant's subjective complaints, and

9    limitations identified by the doctor conflicted with the claimant's daily activities).

10                          *b.      Plaintiff's improvement with treatment*

11        The ALJ observed that Dr. Cushman believed Plaintiff "would improve significantly" with

12   treatment.  (Doc. 7-3 at 41)  As discussed above, the ALJ reviewed the record and found, in fact, that

13   Plaintiff's "condition improved dramatically with treatment." (*Id.* at 42)  Because Plaintiff's condition

14   improved with treatment, as Dr. Cushman predicted, giving reduced weight to the limitations assessed

15   prior to improvement was appropriate.  *See Batson*, 359 F.3d at 1195; *Morgan*, 169 F.3d at 602-03.

16        3.      Opinion of Dr. Kalman

17        The ALJ gave "very little weight" to the opinion of Dr. Kalman, finding there were "very

18   minimal mental status findings" offered to support the opinion.  (Doc. 7-3 at 46)  The ALJ reviewed the

19   questionnaire completed by Dr. Kalman and determined: "Limitations simply come out of the blue

20   without any explanation, and the opinion that the restrictions have been presented since 2008 is simply

21   not corroborated by anything.  Furthermore, the restrictions are contradicted by the treatment records

22   from the prior 7 months." (*Id.*)

23        The Ninth Circuit has determined the opinion of a physician may be rejected when it is

24   "conclusory and brief" and lacks support of clinical findings. *Magallanes v. Bowen*, 881 F.2d 747, 751

25   (9th Cir. 1989); *see also Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (a physician's opinion

26   may be rejected "if brief and conclusory in form with little in the way of clinical findings to support

27   [its] conclusion"); *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (finding "[t]he ALJ permissibly

28   rejected... reports that did not contain any explanation of the bases of their conclusion").  Here, as the

ALJ observed, Dr. Kalman noted only that his findings were based upon the "mental status examination," but failed to explain how the test results supported his conclusions. (*See* Doc. 7-9 at 41-44) Further, Dr. Kalman failed to support his belief that "the earliest date that the description of symptoms and limitations in [the] questionnaire" applied was 2008. (*See id.* at 48) Given the lack of evidentiary support, the ALJ did not err in disregarding the opinion of Dr. Kalman.

####     4.     Opinion of Dr. Martin

The ALJ found the opinion of examining physician Dr. Martin was "consistent with the treatment evidence, including the evidence subsequent to [the] examination, which indicates that the claimant's condition has since stabilized." (Doc. 7-3 at 39)  Specifically, the ALJ observed:

> In terms of work related abilities, [Dr. Martin] felt she has no difficulty understanding, remembering, and carrying out simple instructions or detailed and complex instructions. She has no difficulty maintaining attention and concentration for the duration of the evaluation.  Her pace was not decreased but she demonstrated mild difficulty with pace and persistence.  She had moderate difficulty enduring the stress of the interview.  She would likely have moderate difficulty adapting to changes in routine work-related settings.  Her ability to interact with the public, supervisors, and coworkers appeared to be moderately impaired.

(*Id.*)  The ALJ explained he gave "significant weight" to the opinion of Dr. Martin in limiting Plaintiff "to work involving simple instructions and having no more than occasional contact with coworkers and the public."  (*Id.*; *see also id.* at 37)

Plaintiff argues the ALJ erred in his assessment of this opinion because Dr. Martin "endorsed moderate difficulties in Ms. Henry's ability to engage in interactions not only with co-workers and the public but with supervisors; in her ability to adapt to changes in routine work settings; and even in her ability to adapt to the stresses inherent in their single clinical interview."  (Doc. 10 at 22, emphasis omitted)  According to Plaintiff, "The ALJ incorporated none of those limitations into his determination of Ms. Henry's residual functional capacity, yet he cited no reasons for specifically excluding those limitations from the assessment that he ostensibly credited."  (*Id.*)

Notably, Dr. Martin offered very few conclusions regarding Plaintiff's limitations and abilities to work, beyond finding she had moderate difficulties adapting to changes and interacting with the public, supervisors, and co-workers.  (*See* Doc. 7-8 at 7)  However, Dr. Martin gave Plaintiff a GAF score of 58 (*id.*), thereby indicating Plaintiff had "*moderate* symptoms (e.g., flat affect and

1   circumstantial speech, occasional panic attacks) OR *moderate* difficulty in social, occupational, or

2   school functioning." (*DSM-IV* at 34, emphasis added)  Drs. Goosby and Garcia reviewed the record—

3   including Dr. Martin's findings from the consultative examination—and determined that, despite

4   moderate difficulties with social functioning, Plaintiff was able to perform simple tasks without

5   restrictions on interactions with supervisors.  (Doc. 7-4 at 11, 26; *see also id.* at 15 [finding Plaintiff

6   had moderate limitations on interacting with the general public, but no significant limitations with

7   accepting instructions and responding to criticism from supervisors]).[6]

8        Significantly, the Ninth Circuit has determined the limitation to unskilled work adequately

9   encompasses a claimant's "moderate mental residual functional capacity limitations."  *See, e.g.,*

10  *Thomas*, 278 F.3d at 953, 955.  Specifically, the Court concluded the limitation to "simple, routine,

11  repetitive" tasks accommodated the examining and reviewing physicians' findings that the claimant had

12  a "slow pace" and "several moderate limitations in other mental areas."  *Stubbs-Danielson v. Astrue*,

13  539 F.3d 1169 (9th Cir. 2008); *see also Sabin v. Astrue*, 337 Fed. App'x. 617, 620-21 (9th Cir. 2009)

14  (finding the ALJ properly assessed medical evidence when finding—despite moderate difficulties as to

15  concentration, persistence, or pace—the claimant could perform simple tasks on a consistent basis).

16       Likewise, the Ninth Circuit concluded a limitation to simple tasks adequately encompasses

17  moderate limitations with social functioning.  *See Rogers v. Comm'r of Soc. Sec. Admin.,* 490 Fed.

18  App'x. 15 (9th Cir. 2012) (holding that a residual functional capacity for simple routine tasks, which

19  did not expressly note the claimant's moderate limitations in interacting with others, nonetheless

20  adequately accounted for such limitations); *see also Langford v. Astrue*, 2008 WL 2073951 at *7 (E.D.

21  Cal. May 14, 2008) ("unskilled work . . . accommodated [the claimant's] need for 'limited contact with

22  others'").  Notably, simple and unskilled jobs "ordinarily involve primarily dealing with objects, rather

23  than with data or people).  SSR 85-15, 1985 SSR LEXIS 20.[7]  Indeed, the *Dictionary of Occupational*

24

25  _____

26  [6] Significantly, as explained by the Ninth Circuit, the opinions of non-examining physicians "may constitute
    substantial evidence when it is consistent with other independent evidence in the record." *Tonapetyan v. Halter*, 242 F.3d
    1144, 1149 (9th Cir. 2001).  Because their opinions are consistent with the opinion of Drs. Martin and Cushman (who did

27  not opine that Plaintiff was precluded from interacting with co-workers, supervisors and the public), the opinions of Drs.
    Martin and Cushman are substantial evidence supporting the residual functional capacity assessment.

28  [7] Social Security Rulings (SSR) are "final opinions and orders and statements of policy and interpretations" issued
    by the Commissioner.  20 C.F.R. § 402.35(b)(1).  While SSRs do not have the force of law, the Ninth Circuit gives the

1   *Titles* explains the interaction with supervisors is not significant for positions identified by the ALJ.

2   *See, e.g.*, DOT 361.865-018 (laundry worker), DOT 920.587-018 (hand packer); *see also Hite v.*

3   *Colvin*, 2015 U.S. Dist. LEXIS 107412 at *9, n.4 (C.D. Cal. Aug. 12, 2015) (explaining the level of

4   interaction with others was "not significant" for workers in the positions of laundry worker and

5   handpacker).

6          Furthermore, district courts throughout the Circuit have also concluded a claimant's low

7   tolerance for stress or moderate limitations in dealing with changes are encompassed in a residual

8   functional capacity of simple, repetitive tasks.  *See, e.g., Keller v. Colvin,* 2014 WL 130493 at *3 (E.D.

9   Cal. Jan. 13, 2014) (finding the ALJ "appropriately captured" a physician's opinion that the plaintiff

10  required "low stress settings" by limiting the plaintiff to simple tasks, "equating to unskilled work");

11  *Acuna v. Colvin*, 2015 at *2 (C.D. Cal. Nov. 24, 2015) (finding the plaintiff did not "show a moderate

12  limitation in his ability to respond appropriately to changes in the work setting would preclude him

13  from performing simple, routine tasks…"); *Longston v. Calvin*, 2015 WL 7761065 at *3 (D. Or. Dec. 1,

14  2015) (finding "moderate mental limitation in responding appropriately to changes in the work setting"

15  were encompassed in a limitation to unskilled, simple tasks).

16         Consequently, although Plaintiff contends the ALJ rejected portions of the opinion of Dr.

17  Martin, the restriction to simple tasks encompasses Plaintiff's moderate limitations with dealing with

18  changes, social interaction, and low stress tolerance.

19                              **CONCLUSION AND ORDER**

20         For the reasons set forth above, the Court finds the ALJ set forth clear and convincing reasons

21  for finding Plaintiff lacked credibility, and the ALJ's analysis of the medical record was proper.

22  Further, the RFC determination incorporated the limitations and abilities as assessed by Dr. Martin, and

23  is supported by substantial evidence in the record.  Consequently, the ALJ's determination that Plaintiff

24  is not disabled must be upheld by the Court.  *Sanchez*, 812 F.2d at 510.

25         Based upon the foregoing, **IT IS HEREBY ORDERED**:

26         1.      The decision of the Commissioner of Social Security is **AFFIRMED**; and

27

28  rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d
    1453, 1457 (9th Cir. 1989); *see also Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006).

2.      The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff Vanessa Henry.

IT IS SO ORDERED.

Dated:   **January 14, 2016**                              **/s/ Jennifer L. Thurston**
                                                    UNITED STATES MAGISTRATE JUDGE

28